TERRI KEYSER-COOPER
Law Office of Terri Keyser-Cooper
Nevada Bar No. 3984
3590 Barrymore Dr.
Reno, NV 89512
(775) 337-0323
keysercooper@lawyer.com

KERRY S. DOYLE
Doyle Law Office, PLLC
Nevada Bar No. 10866
8755 Technology Way, Ste. 1
Reno, NV 89521
(775) 525-0889
kerry@rdoylelaw.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

CHARLES TOLLIVER; J.T., a minor by and
through her guardian ad litem CHARLES
TOLLIVER; and T.M., a minor by and through
her guardian ad litem NANCY MARRIOTT-
TOLLIVER,

                Plaintiffs,

      vs.

LYON COUNTY SCHOOL DISTRICT, and
CITY of YERINGTON.

             Defendants.
_____/

**COMPLAINT**
**JURY DEMAND**

     The use of the word "nigger" is the most reviled word in the American dictionary. Nearly 20 years ago, the Ninth Circuit held: "It does not take an educational psychologist to conclude that being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, being shamed and humiliated on the basis of one's race, and having school authorities ignore or reject one's complaints would adversely affect a Black child's ability to obtain the same benefit from school as her white counterparts." *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1033-34 (9th Cir. 1998).

1

J.T. and T.M. are 14-year-old African-American girls who are persistently harassed, tormented and called "niggers" by their classmates at Yerington High School ("YHS"), a rural Nevada high school with a small minority of black students. So far, 22 students have been identified as harassers. If school administrators have taken any action to prevent this conduct, such action is unknown and ineffective. Deputy Superintendent of Education for the Lyon County School District ("LCSD"), Alan Reeder ("Reeder"), dismissively states: "We cannot control other peoples' behaviors." Yerington Police Chief Darren Wagner, ("Wagner") insists the speech of a YHS student wearing guns and knives threatening to go "nigger hunting" is protected by the First Amendment. Wagner, in shredding the complaints made by the girls and their families, claims there is nothing his office can do because these threats are legal and protected. Such is the atmosphere J.T. and T.M. face in Yerington and at YHS.

After every horrific school shooting, educators say: "If you see something, say something!" After every school massacre, educators wonder: "What were the telltale signs? How could this have been prevented?" Here, there is no mystery. YHS is a hotbed of racist misconduct and threats. The warning signs are obvious; Plaintiffs do not want to wait until gunfire erupts and students are slaughtered before action is taken. This lawsuit is brought because the racial behavior at YHS goes far beyond simple teasing and name-calling and is severe, pervasive, persistent and dangerous. There are students with knives and guns threatening to go "nigger hunting" and a law enforcement community that has empowered them. This Complaint and its accompanying Motion for Preliminary Injunction are necessary because not only are the girls deprived of the educational benefit of learning in a supportive scholastic environment free of racism and harassment but they are also threatened with grave physical danger.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331, 1343, 2201, and Title VI of the Civil Rights laws.

2.     Venue in this action is appropriate in the Northern District of Nevada pursuant to 28 U.S.C. Section 1391(b) because the unlawful acts and practices alleged herein occurred in Northern Nevada, which is within this judicial district.

3.     This Court has jurisdiction to grant the declaratory relief requested pursuant to 28 U.S.C. Section 2201 and Federal Rule of Civil Procedure ("FRCP") 57.

**PARTIES**

4.     Plaintiff CHARLES TOLLIVER ("Tolliver") is a citizen of the United States residing in the County of Lyon, Nevada, the father of J.T. and married to NANCY MARRIOTT-TOLLIVER. Tolliver is African-American. Tolliver brings this action on his own behalf and as guardian ad litem on behalf of his daughter J.T.

5.     Plaintiff NANCY MARRIOTT-TOLLIVER ("Marriott-Tolliver") is a citizen of the United States residing in the County of Lyon, Nevada, the mother of T.M. and married to Tolliver. Marriott-Tolliver is Caucasian. Marriott-Tolliver brings this action as guardian ad litem on behalf of her daughter T.M.

6.     Plaintiff J.T. is a minor and a resident of Lyon County.

7.     Plaintiff T.M. is a minor and a resident of Lyon County.

8.     Plaintiffs J.T. and T.M., when appropriate, are collectively referred to as "the girls."

9.     Defendant LYON COUNTY SCHOOL DISTRICT ("LCSD") is a public entity duly incorporated and operating under Nevada law as a school district. LCSD receives Federal financial assistance. Defendant LCSD, at all times relevant, was responsible for the policy, practice, supervision, implementation, and conduct of personnel and entities working as employees and/or agents at YHS. The LCSD is charged with the responsibility of providing a learning environment that is safe and respectful for students and free from bullying on the basis of race. The LCSD at all times maintains the right and obligation to prohibit and or punish student speech that "materially disrupts" or invades the rights of students on the basis of race.

10.     Defendant CITY OF YERINGTON ("Yerington") is a municipal corporation, a governmental entity, duly organized and existing under the laws of the State of Nevada. Yerington receives Federal financial assistance. Under its authority, Yerington operates the Yerington Police Department ("YPD").

## **FACTUAL BACKGROUND**

11.     YHS is a high school in the LCSD. YHS has a very small percentage of African-American students. YHS is almost entirely composed of Caucasian students with some Hispanic and Native American students.

12.     On or about August 19, 2017, before the start of the school year, a student at YHS, C.T., called J.T. and T.M. "niggers" while they were waiting in line at the Lyon County fairgrounds for a carnival ride. C.T. also said she would "beat them until she saw her knuckles bloody." The girls, greatly disturbed, reported the incident to Tolliver and Marriott-Tolliver who later reported it to YHS and the LCSD.

13.     J.T. had never met C.T. before that night; C.T. and J.T. had no ongoing dispute or reason to dislike each other aside from C.T.'s racist epithets and threats.

14.     On or about August 25, 2017, at a football game at YHS, J.T. was watching the game and sitting next to another YHS student J.B. T.M. was nearby. C.T. said to J.B., "I thought you didn't like niggers." J.B. got up and walked away. The girls, greatly disturbed, reported the incident to Tolliver and Marriott-Tolliver, who later reported it to YHS and the LCSD.

15.     C.T.'s behavior was not limited to extracurricular activities. Beginning on or about the first day of the 2017 YHS school year, C.T. and her friend L.U. called J.T. nigger on a near daily basis in the hallways of YHS for more than **three months**. Another female student, S.V., stood by C.T. and L.U. The name-calling was focused on J.T., but T.M. was sometimes present and a target of the racist epithets.

16.     C.T. and her friends L.U. and S.V., would not only call J.T. a nigger, but would also block her passage, snicker, point, taunt, and laugh at her. The girls told Tolliver and Marriott-Tolliver who warned them not to react lest they "get in trouble."

17.     J.T. was on the cross-country team. C.T., who had no involvement with the cross-country team, would watch practice and yell profanities at J.T., calling her a nigger and telling her to "suck my clit."

4

18.     C.T. sent J.T. a message via Snapchat during one cross-country practice.   The message contains a picture of C.T., sticking out her tongue and raising her middle finger.   The picture is captioned "Suck my clit bitch!"

19.     On or about September 12, 2017, less than two weeks after the start of the school year, a boys' volleyball game took place in the YHS gym. J.T. was sitting with male student J.B. and T.M. was nearby. C.T. said to J.B. in a voice loud enough for J.T. to hear, "I thought you didn't like niggers." J.T. turned to T.M., telling her she wanted to leave because of what C.T. had said.

20.     C.T. was sitting between J.T. and J.T.'s backpack.  Because J.T. wanted to leave, she asked C.T. to move so she could get by. C.T. would not move and continued to insult and taunt J.T. T.M. told C.T. to "grow up," and C.T. instead threatened to fight T.M. and J.T. The girls immediately left the game and went home. The girls reported this to their parents who then reported it to YHS Principal Duane Mattice ("Mattice") and Assistant Principal Monie Byers ("Byers").

21.     On September 13, 2017, Marriott-Tolliver reported these incidents in writing to YHS by e-mailing Mattice and Byers.  Marriott-Tolliver reported the many incidents of C.T., L.U. and S.V.'s use of racist epithets, threats, incitements to fight, and physical interference, including two that had happened that day and the incident at the volleyball game the night before.

22.     Mattice made no response.  Byers stated that she would investigate, stating that there had been insufficient time to complete an investigation on the day of Marriott-Tolliver's report.

23.     That afternoon, Marriott-Tolliver picked the girls up from school. As the three drove toward the exit of the school parking lot, T.M. pointed out C.T. sitting nearby in a dark blue truck. C.T. saw the girls and began cursing at them, calling them "bitches and cunts." Marriott-Tolliver parked the car, got out, and began video-recording while C.T. screamed profanities. Both girls jumped out of the car and began hollering at C.T., but Marriott-Tolliver cautioned them to get back in the car and be quiet. C.T. turned her aggression on Marriott-Tolliver, calling the older woman a "bitch" and a "cunt."

24.     Marriott-Tolliver saw that C.T.'s stepfather, Trinity Eriksen, a YHS football coach and LCSD employee, was in the parking lot and should have been able to hear his step-daughter's profanities.  Marriott-Tolliver walked over to Eriksen, asking him: "Is this how you allow your

child to speak to an adult?" As Marriott-Tolliver approached Eriksen, C.T. continued yelling at her and attempted to block her physically.

25.   Eriksen responded by calling Marriott-Tolliver, a "fucking bitch." Eriksen warned Marriott-Tolliver to: "Get the fuck out of here, we will let the school handle this." Jeff Miller, another YHS football coach and Lyon County Sheriff's deputy, was also present and told Marriott-Tolliver, "Get the fuck out of here."

26.   Marriott-Tolliver telephoned Byers multiple times. Unable to reach Byers, Marriott-Tolliver e-mailed Byers a written report and the video of the incident.

27.   On the evening of September 13, 2017, J.T. and T.M. had powder puff football. Tolliver and Marriott-Tolliver came to watch. Marriott-Tolliver received a call from Byers saying Trinity Eriksen had called her explaining that Marriott-Tolliver had been in a "confrontation" with his stepdaughter, C.T. Byers told Marriott-Tolliver that she was immediately "trespassed from school grounds" for having a confrontation with a student. Byers told Marriott-Tolliver she was a "danger" to students.

28.   Marriott-Tolliver told Byers she had a video of the incident, repeated her previous day's report that C.T. had been calling her daughters "nigger" for weeks and trying to provoke fights with the girls, and referred Byers to the earlier e-mail in which Marriott-Tolliver described the incident with C.T. Byers, dismissive of the video, reiterated her command that Marriott-Tolliver leave the school grounds immediately and not return until the matter was resolved.  Byers reduced the direction to writing, e-mailing Marriott-Tolliver, with a copy to Mattice, telling Marriott-Tolliver not to "come on campus again until we sort all of this out."

29.   The next morning, September 14, 2017, Tolliver took J.T. and T.M. to school as Marriott-Tolliver was "trespassed" from school grounds. Tolliver wanted to speak to Mattice about the racial harassment occurring near daily and the parking lot incident of the day before. Tolliver was disgusted and upset, the family had notified Mattice and Byers of the nigger taunts, harassment and humiliation, but the only action that appeared to have been taken was an order that his wife not be allowed on campus. Mattice and Byers claimed to need to investigate C.T.'s behavior before

taking any action, but Byers had trespassed Marriott-Tolliver without any further inquiry. Tolliver was angry and wanted to hear what was being done to stop racial tormenting and harassment.

30.     As Tolliver, J.T. and T.M. went into the school that morning, they saw C.T. and Trinity Eriksen in front of the school. Eriksen told Tolliver he was there to "press trespass charges" against Marriott-Tolliver based on her "confrontation" with C.T. Tolliver told Eriksen not to talk to his wife, Marriott-Tolliver, the way he had talked to her the day before and proceeded into YHS to meet with Mattice.

31.     Although Tolliver told Mattice he was there to discuss his daughters being called "niggers" and he wanted something to be done to stop the racist conduct, Mattice belittled the seriousness of the issues Tolliver was raising and demonstrated his insensitivity to the issues by commenting instead upon how well he hoped the girls' basketball team would be that year with the addition of J.T. to the school.

32.     Mattice further infuriated Tolliver by refusing to discuss the reports of C.T., L.U., and S.V.'s race-based bullying of the girls, instead insisting on meeting with the girls alone to obtain statements regarding the previous afternoon's "confrontation" between Marriott-Tolliver and C.T.

33.     Tolliver was so angered by Mattice's refusal to address the racism running rampant in his school, Tolliver called Mattice a bigot, excused himself from the meeting, and left the school. Byers called Marriott-Tolliver to come to the school and be present for the remainder of the investigation because the police were there.

34.     Marriott-Tolliver was allowed to be present at the school while the girls were interviewed by Mattice, Byers, and Officer Flores ("Flores") of the YPD. Marriott-Tolliver and the girls spent more than 1½ hours with Mattice and Byers recounting the daily taunting, harassment and racist hostility. Marriott-Tolliver, J.T. and T.M., at the direction of Mattice, also wrote statements for Flores.

35.     Marriott-Tolliver was also given an opportunity to show the video of her "confrontation" with C.T. to Byers, Mattice, and Officer Flores. Flores later showed the video to Eriksen.  Based upon the video evidence showing C.T. was the aggressor and had lied about her

conduct, the "trespass" order against Marriott-Tolliver was lifted and all allegations against her were dropped.

36.     Despite the time spent, no apparent action against C.T. was taken.  C.T. and her friends continued verbally harassing J.T. and T.M. in the halls, bathrooms, and at extra-curricular activities.  Marriott-Tolliver notified Byers of the ongoing behavior and her concern that YHS had swept aside their complaints in the "investigation" into her "confrontation" with C.T.

37.     Byers, copying Mattice, claimed to be "addressing the situation," but citing privacy concerns, informed Marriott-Tolliver she could not reveal what, if any, disciplinary actions were taken.

38.     It does not appear any disciplinary action was imposed on C.T. because her conduct continued, becoming even more aggressive. If YHS or LCSD imposed any disciplinary action on C.T. or her friends, it was ineffective to stop their behaviors.

39.     Indeed, on or about September 25, 2017, J.T. was in the restroom when C.T. shoulder bumped her so hard J.T. was nearly shoved into the bathroom door.  J.T. immediately reported this incident to Mattice, who was in the hallway.  Mattice responded that he was busy and would have to get back to J.T.; he never did.

40.     Instead of continuing to contact the non-responsive YHS administration, Marriott-Tolliver contacted Alan Reeder ("Reeder") of the LCSD.  She was instructed to make reports of the bullying via the Nevada Department of Education website and told that Byers had informed the LCSD there had been no issues in the previous week.

41.     Marriott-Tolliver electronically reported her bullying complaints via the Department of Education's website and received confirmations of their receipt, informing her that YHS would create a safety plan for the girls and begin an investigation.

42.     Marriott-Tolliver was informed and believes that the reports were sent directly to Reeder who then sent them to Mattice to handle.

43.     On September 27, 2017, Marriott-Tolliver met with Reeder at the LCSD with J.T. and T.M. The purpose of the meeting was to discuss the name-calling, threats, profanity, and

hostility against the girls. Marriott-Tolliver and the girls spent over one hour discussing the details of the situation and providing Reeder with written statements. Reeder said he "would look into it."

44.    Marriott-Tolliver, Tolliver, and the girls never received a safety plan or written reports of any investigations by YHS or LCSD as required by NRS Chapter 388.

45.    Instead of resolving issues, YHS teachers became directly involved in the defense of the racist environment at YHS. On or about October 2, 2017, T.M.'s Health class, taught by Mrs. Mattice the wife of Principal Mattice, had a lesson on mental health that turned to a discussion of racism, the KKK, and bigotry. Mrs. Mattice asked the class to tell her about problems in their daily lives that might be causing them stress. T.M. raised her hand and said, "I don't like being called a nigger." Mrs. Mattice shot back: "It goes both ways!" T.M. said, "How does it go both ways?" Mrs. Mattice said words to the effect of "people can be racist about anything." T.M. was extremely uncomfortable with what she perceived as Mrs. Mattice's defense of the use of the word "nigger" and dismissiveness about the noxious history associated with the word.

46.    Without teachers or administrators effectively disciplining C.T. and her friends, they too continued their harassment of J.T. On or about October 3, 2017, J.T. was coming out of a door at school with male student J.B. L.U., who was outside, looked over her shoulder to J.B., called J.T. a "bitch," and turned her backpack to force J.T. to walk into a bush or be struck. J.T. and Marriott-Tolliver reported the incident to Byers who said she would "review the cameras" and "investigate."

47.    Byers later stated that it appeared to her that L.U.'s conduct was accidental. Tolliver and Marriott-Toliver asked to review the videotape with Byers given the history of YHS's treatment of the girls' complaints. Tolliver and Marriott-Tolliver set a meeting with Byers for the morning of October 6, 2017, before school started to review the videotape of the incident in Byers's office.

48.    On or about October 6, 2017, J.T., Tolliver, and Marriott-Tolliver went to the school to review the video. When the family emerged from their vehicle, C.T., L.U., and S.V. and two other girls blocked the sidewalk, forcing the family to walk around them in the grass. C.T. approached Tolliver, an adult African-American male, and said: "You don't even know the definition of a nigger!" J.T., shocked and outraged that C.T. would use racial epithets toward her father, threw down her backpack and went toward C.T.

49.     Tolliver immediately told J.T. to watch herself, retrieve her backpack, and to go quietly into the office. Tolliver cautioned J.T. not to say anything to C.T. and not to risk getting herself in trouble because she was angry at C.T.

50.     C.T. continued her verbal assault of Tolliver, saying: "Nigger means ignorant, your daughter is ignorant." Turning toward C.T., Tolliver said: "If you call my daughter a nigger again, there will be consequences." Tolliver, Marriott-Tolliver, and J.T. proceeded into the office for their meeting with Byers.

51.     Instead of being greeted by Byers as planned, Mattice met them in the office. Tolliver, disappointed with Mattice and his wife's treatment of their family, politely refused Mattice's offer to meet with the family, stating that they would wait for Byers.

52.     Mattice reacted nonsensically, telling Tolliver that this was the second time he had violated the school's "civility" policy, delivered Tolliver a copy of the policy, and informed him that based upon those violations Tolliver would be trespassed from the school for a year and that Mattice would be calling law enforcement to enforce the order.

53.     Mattice trespassed Tolliver for this second "incident of incivility" despite there being no apparent repercussions for Caucasian men, including Trinity Eriksen and Jeff Miller, who repeatedly used profanities and otherwise violated the so-called civility policy.

54.     Tolliver reacted angrily, telling Mattice that he could call the police as Tolliver knew he had done nothing unlawful. J.T., hoping to avoid further conflict, encouraged her father to leave before the YPD were called and walked him to the front door of the school, where C.T., L.U., S.V. and their friends were still standing.

55.     Tolliver left the school grounds, but C.T. continued taunting J.T., who reacted by again approaching C.T. and yelling back at her.

56.     Byers approached as J.T. reacted to C.T.'s taunts and, labelling J.T. the aggressor, suspended J.T. for three days beginning that morning. It is unknown if C.T. or L.U. received any discipline.

57.     The family had gone to watch the videotape of a confrontation between J.T. and L.U., but in the flurry of trespass orders and suspensions the video was not watched.

58.     When Tolliver left the school grounds, he parked near the school, waiting for his family to finish meeting with administrators and for the YPD to arrive so that he could give his statement.   YPD Officers Del Guidice and Spinuzi arrived at the school first, but later joined Tolliver who was still waiting outside the school.

59.     After J.T. and Marriott-Tolliver joined Tolliver and the YPD officers, the family gave oral reports to the police regarding the day's events. The family then went to the LCSD building to file additional statements. After going to the LCSD, the family went to the YPD to file additional written reports.

60.     On the evening of October 8, 2017, J.T. and T.M. were together in their room when they saw friends' posts on Snapchat.  Those friends screenshotted a post by YHS student D.C. that depicted, R.B., another YHS student, in his underwear, bare chested, with knives and guns, and the caption: "The redneck god of gods we about to go nigger huntin."

61.     In another snapchat photo, R.B. with the same knives and guns, is pictured saying: "Porch monkeys here I come."

62.     Soon after, another YHS, M.L. posted a response to the Snapchat photos, stating: "If y'all get offended over words such as nigger or porch monkey then you just need to learn to grow the fuck up and quit being such a libtarted [sic] piece of shit. That's all I gotta say to you niggers."

63.     The girls were shocked, horrified, and terrified by the Snapchat posts of their classmates. After showing the images to their parents, both girls stayed up all night crying.

64.     That night, Marriott-Tolliver reported the incidents and the names of all three of the boys who made the posts to Reeder by e-mail attaching the images.  Marriott-Tolliver informed Reeder that neither she nor Tolliver felt that the girls were safe in the school.  Reeder made no commitments to investigate or discipline the students, saying only that he would "be in touch."

65.     In addition to reporting the racist, cyber-bullying threats to the LCSD, Marriott-Tolliver contacted Joe Hart of Channel 4 news and the President of the local chapter of the NAACP.

66.     It was reasonably foreseeable that the racist Snapchat posts would reach the entire school community and would cause substantial disruption at the school.

67.     When faced with an identifiable threat of school violence, schools may take disciplinary action in response to off campus speech that causes or may cause disruption at the school.

68.     On October 9, 2017, both girls stayed home from school. T.M. was too upset and scared to go to school and J.T. was actually relieved that she was suspended and could stay home where she felt safe. Marriott-Tolliver went to the school to let them know T.M. would not be going to school and to pick up any homework the girls might have.

69.     On or about October 9, 2017, Marriott-Tolliver received a telephone call from LCSD Superintendent Wayne Workman requesting that she and Tolliver come to his office to discuss the problem of racial harassment. Marriott-Tolliver and Tolliver were informed that another YHS student, R.H. and friends, had been driving around the school flying the confederate flag. Tolliver and Marriott-Tolliver went to the LCSD, spending approximately two hours discussing the racist nightmare at YHS. Superintendent Workman and Deputy Reeder said they would "investigate everything."

70.     On October 9, 2017, Officer Flores of the YPD, took statements from Tolliver, Marriott-Tolliver, and T.M. Flores told Marriott-Tolliver that the racist statements posted by YHS students with knives and guns coupled with threats to go to "nigger hunting" were protected by the First Amendment and were "free speech." He told the shocked Marriott-Toller that nothing would be done.

71.     Although law enforcement alleged they could do nothing to protect the girls from the racist threats their classmates had made, that night or the next day Deputy Spinuzzi of the Lyon County Sheriff's Office served Tolliver with a temporary restraining order filed by Michelle Eriksen on behalf of her two YHS daughters C.T. and L.T.

72.     T.M. and J.T. (who was still suspended) again stayed home from school on or about October 10, 2017, because they were even more frightened after hearing that the racist threats had been accompanied by students flying the confederate flag at YHS.

73.     J.T. was alerted that she would be required to sign a "behavioral contract" authored by Byers in order to return to school after her suspension. J.T. and T.M. went to the LCSD with

Tolliver for J.T. to sign a behavioral contract. At that time, Byers informed T.M. that if she had any confrontations with C.T., J.T. would be punished for it.

74.     That day, Marriott-Tolliver also wrote to Reeder to challenge Mattice's letter trespassing Tolliver, which they received by certified mail as their children were being threatened and YHS appeared to be doing nothing to stop the wrongdoers. In the official letter, Mattice attempted to justify his actions by claiming that Tolliver had threatened C.T. when he told her there would be consequences if she called his daughters niggers again.  Even if it could be considered wrong to tell a misbehaving child there will be consequences for her actions, Mattice could not have relied on Tolliver's statement to C.T. because he had no knowledge of it at the time he trespassed Tolliver.

75.     On or about October 11, 2017, J.T. and T.M. returned to school. Students called them "snitches" because their parents, Tolliver and Marriott-Tolliver, had reported the Snapchat posts to the administration.

76.     On or about October 12, 2017, Marriott-Tolliver went to the YPD requesting to speak to Officer Flores and to obtain copies of all the police reports filed by the family. Flores said he did not have any reports because they were "shredded." Flores said he was told by his Chief, Darren Wagner, to shred them. Flores said there were "no crimes" and therefore no need to keep any of the reports.[1]

77.     On or about October 13, 2017, Marriott-Tolliver spoke with Lyon County Sheriff Alvin McNeil ("McNeil"). McNeil said the postings were protected under freedom of speech and were a "parental issue." McNeil admitted that boy with the knives and guns who said he was going "nigger hunting" was the son of his deputy, Josh Barnes, who would handle it "as a parent."

78.     On or about October 13, 2017, Tolliver and Marriott-Tolliver had an on-camera interview with Joe Hart of Channel 4 News, which aired before October 16, 2017.

---

[1] Marriott-Tolliver was shocked that police reports would be shredded. Marriott-Tolliver had previously worked for a law enforcement entity and knew that complaints and reports were never shredded.

79.      For the rest of October 2017, incidents of harassment continued occurring to J.T. and T.M. Students who were emboldened by the absence of apparent discipline to wrongdoers at the school and desirous of attention by the news media, harassed J.T. and T.M., calling them snitches, bitches, and niggers while berating them and their parents for having gone to the news media. Both girls reported the incidents to the school and wrote reports and were told the incidents would be "investigated."

80.      One male student, male J.T. [2] told T.M.: "You and J.T. are punks for going to the news with this and if you weren't niggers you wouldn't have this problem." Friends ignored J.T. and T.M. at lunch. Another student, R.B. said he would say nigger and cry about it so he could get on the news too. A different student approached J.T. saying: "Why did you and T.M. have to go to the news? It's not our fault that you and T.M. are pathetic ignorant bitches." Male J.T. told T.M., "No one likes you guys because you take everything to the news and if you weren't niggers this wouldn't be happening." Other students such as B.C., D.N. and E.M. made comments on Facebook saying the girls "deserved" what they were getting.

81.      The racist comments made by YHS students on October 30, 2017 were reported to Mattice and Byers who said they would "investigate."

82.      While the girls were trying to deal with the ongoing harassment at school, Tolliver and Marriott-Tolliver were trying to challenge the trespass letter Mattice issued to Tolliver. They in a meeting with Workman and Reeder, they discussed the trespass letter and obtained permission for Tolliver to attend the girls' sporting events and to pick them up and drop them off at school. However, Tolliver would need to seek permission from Mattice to be on school grounds for any other reason. LCSD and YHS refused to rescind the trespass letter, stating that they simply could not give Tolliver "the opportunity to come and go without asking permission" unless he could make it through the basketball season without further incidents.

---

[2] Because this male student's initials are identical to plaintiff J.T., he has been differentiated by referring to him as male J.T.

83.     Tolliver, whose daughters were attending school with boys who had posted photos of themselves with weapons saying they were going to hunt niggers, was prohibited from being on campus because somehow he was a threat.

84.     Tolliver was so scared for his daughters' safety and occupied with police reports and meetings with the LCSD that he turned down work on projects that were in Reno or further away because it made him too anxious to be away from Yerington in case something happened at the school.

85.     The cyber-bullying continued as a student accessed J.T.'s Snapchat account. On or about November 25, 2017, a YHS student approached J.T. asking if she had sent a Snapchat message to all of her Snapchat contacts that said: My name is J.T. Toliver and I like to "fuck boys on quads and I am the biggest and most hated slut in Yerington." J.T., in shock, had no idea who had hacked into her account and sent out the message. Soon after the hacked message was sent out, students had screenshot the message and reposted it. J.T. and Marriott-Tolliver immediately reported the conduct to Byers, who again repeated that she would investigate.

86.     Students' racial slurs also continued as during this time, M.L., who had posted the Snapchat comment defending the use of the words "nigger" and "porch monkey," told J.T. and T.M. they were "niggers" and made it clear that he "doesn't regret calling them niggers" because now he is "famous."

87.     On or about December 8, 2017, the girls telephoned Marriott-Tolliver to pick them up as the school had invited a speaker to comment to the student body on racial issues. The speaker, an alumnus who was formerly related to Trinity Eriksen and has no apparent public-speaking or diversity training, defended Yerington, saying "only a few people" were behaving in a racist manner and it ought not and did not taint the entire community. The speaker praised Yerington. The girls were the focus of attention as students began staring at them, leaving them feeling ostracized and uncomfortable. The girls felt targeted, as if they were the cause of the problem and by raising the issue of the racial hostility against them, were being singled out for dislike and hostility.

88.     J.T. and T.M., began having difficulty sleeping and experienced severe headaches due to stress and fear. The girls worried continually about "what's next" – what other horrifying

post or message or racist comments would they will be subjected to. The girls wanted to be accepted and have normal high school lives.

89.     Tolliver has likewise suffered mental anguish and sleepless nights, concerned that something will happen to his daughters and he will be prevented from assisting them by the trespass order.  Tolliver's anxiety was so extreme that he missed job opportunities outside of Yerington, worried that he would not be close enough to home if something happened.

90.     J.T. and T.M.'s academic performance suffered and continues to suffer because of the racist conduct and the days missed from school in visits to Mattice and Byers and the offices of the LCSD.

91.     J.T. and T.M.'s personal life has deteriorated, they are angry, upset, depressed, and worried about how they can endure three more years at YHS.

## FIRST CAUSE OF ACTION

**(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et. seq)**
**Discrimination on the Basis of Race at YHS**
**Against Defendant LCSD**

92.     Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

93.     Upon information and belief, LCSD is a recipient of Federal financial assistance.

94.     Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color or national origin. 42 U.S.C. § 2000d. Public educational institutions that receive federal funds are subject to this mandate. 34 C.F.R. § 100.13(i)(2000) (defining "recipient" to include any public "agency, institution, or organization, or other entity – in any State, to whom Federal financial assistance is extended"); see also *id.* § 100.13. (g)(2)(ii).

95.     Actions that restrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving a service, financial aid, or other benefit under a school system are discriminatory. See 34 C.F.R. § 100.3(b)(1)(iv); see also *id* § Section 100.13(g)(2)(ii).

96.     The acts and omissions of LCSD, including the acts and omissions of LCSD officials and employees, violated the rights of J.T. and T.M on the basis of race.

97.     The totality of the racially hostile acts of YHS students towards J.T. and T.M. had the cumulative effect of the creation of a racially hostile environment that denied J.T. and T.M. a supportive scholastic environment free of racism and harassment.

98.     This intentionally racially hostile conduct was purposeful, severe, pervasive and persistent so as to interfere with and limit the ability of Plaintiffs to participate in or benefit from the services, activities or privileges provided by YHS. This intentional conduct by LCSD and its agents and employees amounts to deliberate indifference of the federally protected rights of J.T. and T.M.

111.   Officials at LCSD and YHS with authority to address the discriminatory conduct and to institute corrective measures had actual knowledge of the discrimination toward J.T. and T.M.

99.     LCSD and YHS officials had actual notice that J.T. and T.M.have been called racially offensive epithets for more than **three months**, in the hallways, restrooms, gyms, school parking lot, and other locations.

100.    LCSD and YHS officials had actual notice that harassment of J.T. and T.M. based on race was so severe, pervasive, and offensive that it created a hostile climate depriving J.T. and T.M. of access to educational programs, activities, and opportunities.

101.    LCSD and YHS officials had actual notice that harassment of J.T. and T.M. based on race was so severe, pervasive, and offensive that it deprived J.T. and T.M. of the educational benefit of learning in a supportive scholastic environment free of racism and harassment.

102.    LCSD and YHS officials had substantial control over the circumstances of the racially discriminatory harassment of J.T. and T.M. The harassment occurred primarily on YHS grounds, in hallways, in the bathroom, in the gym, in the school parking lot and at other locations.

103.    LCSD and YHS officials had substantial control over the circumstances of the discriminatory harassment of J.T. and T.M. because the harassers were students and school officials are responsible for controlling student conduct in schools.

104.    LCSD and YHS officials exhibited deliberate indifference to the racial harassment of J.T. and T.M. based on race in violation of Title VI. Through their unlawful deliberate indifference, LCSD caused J.T. and M.T. to be subjected to the above-described racial discrimination.

105.     LCSD and YHS officials exhibited deliberate indifference to the racial harassment of J.T. and T.M. by responding ineffectively and or failing to respond in a manner that effectively stopped the discriminatory harassment.

106.     LCSD and YHS officials exhibited deliberate indifference to the racial harassment of J.T. by suspending her and not suspending the Caucasian students that LCSD knew had a history of calling J.T. racially insulting noxious names.

107.     LCSD and YHS officials exhibited deliberate indifference to the racial harassment of J.T. and T.M. by failing to find a supportive manner to inform J.T. and T.M. that actions were being taken to halt the racist conduct of YHS students, thereby causing J.T. and T.M. continuing fear, humiliation, and worry over "what would happen next."

108.     LCSD and YHS officials exhibited deliberate indifference to the racial harassment of J.T. by suspending J.T. in circumstances where she was reasonably defending herself from racist students' intent on calling her and her father racially insulting noxious names.

109.     LCSD and YHS officials exhibited deliberate indifference to the racial harassment of J.T. and T.M. when it had actual notice that its efforts to remediate were ineffective yet continued to use those same ineffective methods to no avail.

110.     LCSD's violations of Title VI were the actual, direct, and proximate cause of injuries suffered by J.T. and T.M. as alleged.

111.     As a direct and proximate result of the aforedescribed unlawful conduct, J.T. and T.M. suffered and are still suffering extreme emotional distress, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their future, damage to their academic present and future, damage to their reputation, disruption to their personal life, and the denial of the benefits of a supportive academic experience to maximize academic potential.

## SECOND CAUSE OF ACTION

**(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et. seq)**
**Discrimination on the Basis of Race**
**Against Defendant City of Yerington**

112.     Plaintiffs reallege and incorporate each and every allegation contained in the preceding paragraphs.

113.     Upon information and belief, Yerington is a recipient of Federal financial assistance.

114.     Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color or national origin. 42 U.S.C. § 2000d. Title VI applies to law enforcement agencies.

115.     The acts and omissions of Yerington, through the YPD, violated the rights of J.T. and T.M on the basis of race.

116.     The YPD works with the YHS on school security issues and is frequently called to the school on security issues.

117.     The YPD had actual notice that harassment of J.T. and T.M. based on race because officers of the YPD were called in by YHS officials to obtain statements.

118.     The YPD had actual notice that harassment of J.T. and T.M. based on race because Tolliver and Marriott-Tolliver filed reports of racist threats, harassment, and hostility against J.T. and T.M. with officers of the YPD.

119.     The YPD shredded all reports of the harassment of J.T. and T.M. based on race because the YPD determined there was "no crime" and all actions by the harassers were "protected by the First Amendment."

120.     The YPD determined that it would not investigate D.C. and R.B. for posting the violent true threat of the Snapchat posts because the YPD determined their actions were "protected by the First Amendment."

121.     The Snapchat posts which included knives, guns and racist threats to go "nigger hunting" were true threats because they represented a serious and palpable danger of potential violence against J.T. and T.M.

19

122.     The YPD, in shredding all police reports on racist conduct and the violent true threats of Snapchat posts, determined it would not investigate D.C. and R.B. and would dismiss their conduct as a "parental issue."

123.     The YPD in dismissing the racist conduct and the true threats of the Snapchat posts, racially discriminated against J.T. and T.M. by approving, condoning, and ratifying that no investigation need be made to protect J.T. and T.M.

124.     The YPD in dismissing the racist conduct and true threats of the Snapchat posts, was deliberately indifferent to the potential danger and true threats confronting J.T. and T.M.

125.     The YPD in dismissing the racist conduct and the true threats of the Snapchat posts, racially discriminated against J.T. and T.M. by exposing them to continuing danger from D.C., R.B., and other students.

126.     Reasonable African-American students at YHS, like J.T. and T.M. would perceive the Snapchat posts by D.C. and R.B. featuring knives, guns, and threats of violence to be a true threat and a continuing danger to their health and safety.

127.     As a direct and proximate result of the aforedescribed unlawful conduct, J.T. and T.M. suffered and are still suffering extreme emotional distress, the indignity of discrimination, the invasion of the right to be free from discrimination, and great humiliation which is and was manifest in emotional distress, outrage, severe anxiety about their safety and the threat of future dangerous actions that will go unchecked and uninvestigated based on racially discriminatory actions of the YPD.

**THIRD CAUSE OF ACTION**

**(Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et. seq)**
**Discrimination on the Basis of Race**
**Brought by Charles Tolliver Against LCSD**

128.    Tolliver realleges and incorporates each and every allegation contained in the preceding paragraphs.

129.    Tolliver is African-American and the father of J.T. and the stepfather of T.M.

130.    Tolliver and Marriott-Tolliver have, for months, put LCSD on notice of the persistent racially hostile environment at YHS against J.T. and T.M.

131.    LCSD through its agents and employees at YHS have racially discriminated against Tolliver by giving him a trespass document which warns that if Tolliver comes on YHS property, the YPD will be notified and Tolliver will be arrested.

132.    LCSD through its agents and employees at YHS have racially discriminated against Tolliver by treating him differently than Caucasian parents of students at YHS.

133.    LCSD has actual knowledge of the racially discriminatory conduct toward Tolliver by YHS officials.

134.    LCSD has control of its agents and employees at YHS.

135.    LCSD through its agents and employees at YHS exhibited deliberate indifference to the plight of Tolliver to be treated to the same benefits and privileges of Caucasian parents of YHS students.

136.    LCSD through its agents and employees at YHS exhibited deliberate indifference to the racially discriminatory conduct towards Tolliver and has condoned, approved and ratified the racially discriminatory behavior toward Tolliver.

137.    As a direct and proximate result of the aforedescribed unlawful conduct, Tolliver suffers and is still suffering extreme emotional distress, the indignity of discrimination, the invasion of the right to be free from discrimination, fear of arrest, and great humiliation which is and was manifest in emotional distress, outrage, and severe anxiety.

WHEREFORE, plaintiffs pray for judgment against defendants as follows:

(a)        For declaratory relief;

(b)        For injunctive relief;

(c)        For compensatory damages in an amount to be determined at trial;

(d)        For attorneys' fees and costs incurred herein;

(e)        For leave to amend this complaint should the same become necessary;

(f)        For such other and further relief as this Court may deem appropriate.

DATED:  This 4 day of January 2018

                           /s/ Terri Keyser-Cooper
                          TERRI KEYSER-COOPER
                          KERRY S. DOYLE